1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CHRIS FOWLER,

11              Petitioner,                    No. CIV S-02-2250 GEB JFM P

12        vs.

13   DIANE BUTLER, et al.,

14              Respondents.              FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding through counsel with an application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1984, petitioner pleaded guilty to second

18   degree murder in the death of his then-girlfriend's twenty-two month old son and was sentenced

19   to fifteen years to life in prison.  Twelve years later, in advance of petitioner's initial parole

20   consideration hearing in June 1992, the judge who sentenced petitioner to state prison wrote a

21   letter to a Classification & Parole Representative at California Medical Facility recommending

22   that petitioner be released on parole.  (Ex. 7 to Petition for Writ of Habeas Corpus, filed October

23   15, 2002.)  The judge wrote:

24              The impression I had was of a very immature young adult who,
              after having indulged in the use of marijuana, could not tolerate the
25              demands of a very young child for whom he was the expected
              caretaker.  Blows were struck with [sic] the defendant was
26              awakened by the crying child.  The defendant did initially try to

                                                1

> avoid responsibility by telling obvious falsehoods; however, when faced with the clear evidence of his guilt, he frankly acknowledged that probation was not a fair disposition and that prison was what he deserved.  This court may not know the rehabilitation which Chris Fowler may have achieved; however, based on the background of the defendant and the lack of any true intent to seriously injure the young victim, it would be my recommendation that he be released at this time on parole."

(Id.)  Despite that recommendation, petitioner was denied parole at his initial parole consideration hearing.

Since the initial denial, in spite of the sentencing judge's recommendation, a classification score of zero, the absence of any prison disciplinary conviction after November 1986,[1] a stable and supportive family, offers of employment, an exemplary prison work record, and participation in and completion of numerous self-help and substance abuse programs, petitioner, who is now forty-six years old and the married father of an eighteen year old daughter, has been denied parole at eight subsequent parole consideration hearings from July 13, 1994, through September 26, 2005.

It is the denial of parole from his February 10, 2000 parole consideration hearing that petitioner challenges in this action.[2]  Petitioner claims that his right to due process was violated because (1) there was no reliable evidence to support the denial of parole; and (2) he met none of the statutory criteria for parole unsuitability, "nearly all" the criteria for parole suitability, and cannot comply "to any greater degree" with the recommendations made by the Board of

---

[1]  Petitioner has only had three disciplinary convictions during his entire period of incarceration, all of which were in 1986.  (See Administrative Record, lodged April 29, 2004, (Administrative Record), CDC115, 128As, Disciplinary RPTs, Rules/Violation.)  Only one of those disciplinary convictions was for a serious rules violation.  (See id.)

[2]  The constitutionality of the individual parole denials that occurred subsequent to the February 10, 2000 denial of parole are not before this court for review.  However, in December 2005, respondents moved to dismiss this action on the ground that, inter alia, it was mooted by petitioner's September 26, 2005 subsequent parole consideration hearing, at which petitioner was denied parole for an additional two years.  The transcript of that hearing is appended as an exhibit to respondents' motion.  The relevance of that transcript to the remedy in this case is discussed infra.

2

1  Prison Terms (Board) after the February 2000 hearing.  (Petitioner's Supplemental Points and

2  Authorities in Support of Petition for Habeas Corpus Relief, filed November 18, 2004, at 32.)

3  Petitioner also claims that his rights to due process and to freedom from cruel and unusual

4  punishment were violated by use of unconstitutionally vague terms to support the denial, and that

5  denial based on such terms violated his right to substantive due process.

6          For the reasons set forth below, the denial of parole to petitioner in February 2000

7  was not supported by even the minimal quantum of evidence required to satisfy the requirements

8  of the federal due process clause.  Moreover, the Board's September 26, 2005 decision to again

9  deny petitioner parole for another two years makes manifest and inescapable the conclusion that

10  no purpose will be served in remanding this matter for another parole consideration hearing.  It is

11  therefore the recommendation of this court that the Board of Prison Terms be directed forthwith

12  to set a parole date for petitioner.

13                    FACTUAL AND PROCEDURAL BACKGROUND

14          In 1984, petitioner was convicted pursuant to a guilty plea of second degree

15  murder in the death of his then girlfriend's twenty-two month old son and sentenced to fifteen

16  years to life in prison. At the time of the offense, petitioner was twenty-two years old and living

17  with his girlfriend, Tina Miller, and her two children, Aaron and Christy Miller, in Woodland,

18  California.  (People v. Fowler, Court No. 7841, Report of the Probation Officer, filed December

19  11, 1984 (Probation Report), at 6.)[3]  The day before the offense, petitioner and a group of friends,

20  smoked marijuana and took methamphetamines.  (See Life Prisoner Evaluation, Subsequent

21  Parole Consideration Hearing, October 1999 Calendar (October 1999 Life Prisoner Evaluation),

22  at 1.)[4]  On the night before the offense, petitioner and his girlfriend were up "most of the night"

23

24          [3]  A copy of the probation report is included in Exhibit 3 to the petition for writ of habeas
corpus.

25

26          [4]  The Life Prisoner Evaluation is contained in the Administrative Record in the section
identified as "Board Reports."

1   having "a very emotional argument/discussion about their relationship." (Probation Report at 7.)

2   The day of the offense petitioner "went into town to price fencing." (<u>Id.</u>)  Tina left her two

3   children in the care of her cousin, Jack Reynolds, who watched them until approximately 12:15

4   p.m., when petitioner returned home. (<u>Id.</u> at 8.)  Reynolds stayed at the house until 2:30 p.m., at

5   which point petitioner put the children down for a nap and went into his bedroom to take a nap

6   also. (<u>Id.</u>)  About 30-45 minutes later, Christy woke petitioner up. (<u>Id.</u>)  When petitioner "woke

7   up, he could hear Aaron crying." (<u>Id.</u>)  The probation report sets forth the following account of

8   events given by petitioner to a Sheriff's detective:[5]

9   
> [O]n the day of the offense, [petitioner] was still very upset and
> moody because of the argument the night before with Tina.  While
10  
> sleeping that afternoon, [petitioner] was awakened by Christy who
> told him that Aaron was crying.  He went into his bedroom, very
11  
> angry, and yelled at the child, "What is your problem?"  The child
> was seated on the bed crying.  He raised his hand to Aaron's face
12  
> and slapped him with an open hand.  He later admitted he used full
> force, knocking the child from the bed onto the floor.  After hitting
13  
> him he felt badly and told the child he was sorry and did not mean
> to do it.  He told Detective Goodman he did not want to take care
14  
> of the child in the first place and wanted to "just sleep," he was "so
> sleepy."  He said he could not believe he had struck the child.  He
15  
> picked up the baby and as he lay limp in his arms, the baby's eyes
> rolled back into his head and he thought the baby was dead or
16  
> dying.  He panicked so much he lost his hold of the child and the
> child fell to the floor and hit his head.  He said that this was
17  
> accidental.  He was afraid to tell Tina he had done something
> "wrong and bad."  He kept saying he wanted to sleep.  He also said
18  
> "It's very fuzzy, I'm having a hard time remembering exactly what
> happened."  He picked the baby up again, took him into the
19  
> bathroom and put him into the tub and left him in the bath tub.  He
> stated he felt "out-of-control" and he was afraid of what he might
20  
> do.  He was afraid he would get angry again.

21  (<u>Id.</u> at 11.)  Petitioner called Tina and told her about Aaron's condition. (<u>Id.</u> at 12.)  "He

22  suggested to Tina that the baby was having an asthmatic seizure so as to not have to explain to

23  
_____

24       [5]  The initial story that petitioner gave to the sheriff's detective is set forth at pages 9-10
     of the probation report and is described therein as "fabricated."  The account set forth above was
25  given by petitioner after the sheriff's detective mentioned the possibility of a lie detector test and
     after petitioner was given the warnings required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).
26  (Probation Report, at 10.)

1   her what really happened."  (Id.)  Tina called her mother, a nurse, who lived nearby.  (Id.)  Tina's

2   mother and sister arrived and Tina's mother took over administering CPR to Aaron.  (Id.)  They

3   decided Aaron should go to the hospital, and petitioner drove to Woodland Memorial Hospital

4   while Tina's mother continued to administer CPR.  (Id.)  That evening, Aaron was transferred to

5   the University of California Davis Medical Center (UC Davis Medical Center), where he died

6   two days later.  (Id. at 13.)  The cause of death was "craniocerebral trauma."  (Id.)  Petitioner was

7   arrested at the UC Davis Medical Center.  (Id. at 26.)

8            Petitioner subsequently entered a plea of guilty to charges of second degree

9   murder and was sentenced to fifteen years to life in prison with the possibility of parole.  Prior to

10  this conviction, petitioner had no criminal record.[6]  (Id. at 5.)

11           In 1985, petitioner married a woman he had been friends with since he was

12  fifteen.  (Ex. A to Respondents' Motion to Dismiss, filed December 14, 2005, at 20-21.)  At the

13  time of petitioner's February 2000 hearing, they had been married approximately 14 ½ years.

14  (Id. at 20.)  Petitioner and his wife have one daughter, who was ten years old in October 1999.

15  (October 1999 Life Prisoner Evaluation, at 3.)

16           At the time of his 2000 parole hearing, petitioner had been incarcerated for sixteen

17  years.  His minimum eligible parole date had been set for August 27, 1993, and he had been

18  denied parole at an initial parole consideration hearing in June 1992 and at three subsequent

19  parole consideration hearings in July 1994, September 1996, and October 1997.  (Chronological

20  History included in Administrative Record.)  Petitioner's classification score has been zero since

21  at least June 1996.  (Life Prisoner:  Postconviction Progress Report dated 9/97, attached to

22  Administrative Record.)  Petitioner's only serious rules violation was in October 1986 for

23  fighting with an inmate.  (See Administrative Record, CDC115, 128As, Disciplinary RPTs,

24

25           [6]  The probation report also contains petitioner's Department of Motor Vehicles record,
     which lists five vehicle code violations between February 1982 and May 1983, and "[n]o
26   accidents or failures to appear."  (Probation Report, at 5.)

1  Rules/Violation.)  His last disciplinary conviction was in late 1986 for improper use of a

2  telephone.  (Id.)

3        Petitioner has had repeated psychological evaluations during his incarceration.  In

4  December 1987 and December 1990, reports were prepared which diagnosed petitioner with

5  Amphetamine and Cannabis Abuse, in institutional remission.  (March 29, 2004 Category X

6  Psychological Evaluation, filed  June 3, 2004, at 1.)  The December 1990 report added a

7  diagnosis of "Impulse Control Disorder."  (Id.)  A June 1992 report noted "marked improvement

8  with no diagnosis given."  (Id.)  That report recommended a Category X evaluation prior to a

9  parole date being set for petitioner.  (Id.)

10        In March 1994, a Category X evaluation report was prepared by Marne Ann

11  Trevisano, Ph.D.  In connection with the preparation of the report, petitioner had nine visits with

12  Dr. Trevisano, and several tests were administered.  (Id. at 1, 4.)  Dr. Trevisano diagnosed

13  petitioner with "Intermittent Explosive Disorder," "Polysubstance Abuse (Methamphetamine,

14  Alcohol and Canabis [sic] Abuse, in institutional remission), and "Personality Disorder NOS,"

15  and made the following recommendations:  "(1) that Mr. Fowler continue in self-help chemical

16  abuse treatment groups; (2) that he attempt to find a group which addresses both self-esteem and

17  assertion issues; (3) that he continue with the group for men who have murdered children, if such

18  still exists at Vacaville State Prison; and (4) that if any individual treatment becomes possible

19  that Mr. Fowler be found eligible for such in order to break through his denial and address

20  everything which could have led to this crime."  (Id.)  Thereafter, on April 5, 1994 the San

21  Quentin Psychiatric Council met for two hours with petitioner.  A written report of that meeting

22  was also prepared.  (Category 'X' Psychiatric Council Evaluation, filed June 3, 2004.)

23        In September 1997, another psychological evaluation of petitioner was prepared

24  for the Board of Prison Terms by Dr. Raymond C. Crawford, a clinical psychologist.

25  (Administrative Record, Psych Reports.)  Dr. Crawford's report is as follows:

26  /////

1
2
3
4
5
6
7

Inmate Fowler was seen by the undersigned for his previous Board report in 1996.  At that time he was seen as having matured significantly over the past ten years and that he posed [sic] no significant mental disorder which would preclude his being released to the community.  Subject was described as being more appropriately assertive.  Inmate Fowler has continued to involve himself in both therapy and self-help groups.  In 1997 he had been in individual therapy with Dr. McGahey who described subject as having demonstrated further self understanding and showing a desire to work on his personal development.  Subject has also been actively involved in an anger management group with Dr. Silberstein.  He has been in AA since 1996.  He continues to work as a dental lab technician.

8
9
10
11
12
13
14
15
16
17

On contact inmate Fowler appeared as scheduled and responded spontaneously to inquiry.  He did not exhibit an unusual or psychotic ideation and maintained a courteous and cooperative attitude.  He noted that he has been involved in the Church fellowship program from which he has derived much benefit.  He also explained that alcohol had not been a factor in his offense.  In discussing the offense, he responded intellectually by enumerating the various antecedents which contributed to the offense which included an array of psychological mechanisms.  He explained that he had a big argument with the victim's mother the day before and that his job had been terminated in addition.  He stated that he had spent the previous evening snorting methamphetamine and was awake all night until the next day.  When it was suggested to him that his offense was the result of his own selfish desire to be unencumbered and his feelings of anger at being awakened to attend to the two-year-old victim, he became quite emotional while tearfully admitting to these feelings.  He went on to express his guilt and remorse and noted that he thinks about the crime on a daily basis.

18
19
20

21

Inmate Fowler currently demonstrates intact mentation with fairly good ego-strength.  He has developed prosocial attitudes and the realization that he has to take responsibility for his own actions.  He has developed self-esteem also which appears to be related to his successful vocational training as a dental lab technician and his active approach to both therapy and self-help activities.

22     (Id. at 1-2.)  Dr. Crawford diagnosed substance abuse of cannabis and methamphetamine in

23     remission, and "Personality disorder, not otherwise specified, immature features, greatly

24     improved," and his conclusions were as follows:

25
26

The diagnosed psychopathology is closely related to the offense.  Violence potential in the past has been above average.  Current violence potential is below average.  In a less controlled setting

1
2
3

> such as the community, he would maintain present gains and
> continue to improve.  If released to the community, abstinence
> from drugs and alcohol is advised.  There are psychotic [sic]
> reasons to defer parole at this time.

4  (Id. at 2.)  Petitioner was denied parole at the hearing that followed this evaluation.

5           In 1999, another psychological assessment was prepared by Louis L. Beermann,

6  Ph.D.  Dr. Beermann's diagnostic impression was "substance abuse in remission," with no

7  symptoms noted of any Axis II disorder and no evidence of any Axis III disorder.

8  (Administrative Record, Life-Term Mental Health Evaluation for the Calendar Month of October

9  1999, at 3.)  Dr. Beermann found, inter alia, that petitioner's "judgment and insight appear

10 normal," that "[n]o mental health treatment is indicated at this time," and that petitioner was "not

11 taking any psychotropic medication and his prognosis for continuing a stable life is excellent."

12 (Id.)  With regard to an assessment of dangerousness, Dr. Beermann opined that petitioner

13
14
15

> does not pose more than a normal risk factor whether in or out of a
> controlled environment.  No risk factors are apparent.  This inmate
> was very articulate and cooperative.  In my opinion he would be a
> good candidate for parole.

16 (Id.)

17          The Board's decision in 2000, the decision at issue in this case, was grounded in

18 the following factors.  First, the Board found that petitioner's crime was "carried out in an

19 especially callous manner," that "[t]he victim was abused during the offense," and "[t]he motive

20 for the crime was very trivial in relation to the offense."  (Ex. C to Answer, filed January 15,

21 2003, at 28.)  The Board also found that petitioner "had experimented with marijuana and

22 methamphetamine," that he had "not sufficiently participated in self-help and therapy," and that

23 "[t]he psychiatric report prepared for this particular hearing was not conclusive at all,"

24 particularly given the then six-year old Category X report that remained in the record.  (Id. at 28-

25 29.)  The Board went on to note that "petitioner should be commended for having participated in

26 individual therapy in 1997; and he's been disciplinary free since '86; he's been involved in

vector control, dental lab tech; he's got above-average work reports; and AA, NA, Alternatives to Violence" but that those accomplishments did not "outweigh the factors of unsuitability." (Id. at 29.)  The Board indicated that it was going to request another psychiatric council "to address the issues that were raised in the Cat X report," and that they wanted petitioner to, inter alia, "participate in whatever therapy that's available to you here at this institution." (Id.)

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

      Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

      Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

      Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that

1  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

2  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

3  question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

4  omitted).

5          The court looks to the last reasoned state court decision as the basis for the state

6  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

7  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

8  habeas court independently reviews the record to determine whether habeas corpus relief is

9  available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

10  II.  Petitioner's Claims

11       A.  Sufficiency of Evidence

12  _____  Petitioner's first claim is that his right to due process was violated because there

13  was no evidence to support the Board's decision to find him unsuitable for parole.  Petitioner

14  exhausted state court remedies with respect to this claim, which was summarily denied at all

15  three levels of the state court system.  (Answer, at 2-3.)  Respondents contend that the claim does

16  not present a substantial federal question, and that there was some evidence to support the state

17  courts' rejection of the claim.

18          Section 3041 of the California Penal Code provides prisoners sentenced in

19  California to a state prison term that provides for the possibility of parole with "a constitutionally

20  protected liberty interest in the receipt of a parole release date, a liberty interest that is protected

21  by the procedural safeguards of the Due Process Clause.  Irons v. Carey, 479 F.3d 658, 662 (9th

22  Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006);

23  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion v. Duncan, 306 F.3d 895, 903

24  (9th Cir.2002); and Bd. of Pardons v. Allen, 482 U.S. 369, 377-78, 107 S.Ct. 2415 (1987)

25  (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 12, 99 S.Ct. 2100

26  (1979)).)  California law requires that the Board "determine whether a prisoner is presently too

dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal.Code. Regs., tit. 15 § 2402(c)-(d)."  Irons, at 662-63.  The Irons court described the regulations as follows:

> [T]he circumstances tending to show that a prisoner is unsuitable include: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3)"a history of unstable or tumultuous relationships with others"; (4) commission of "sadistic sexual offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." Cal.Code. Regs., tit. 15 § 2402(c). Circumstances tending to show that a prisoner is suitable for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; . . . (6) the prisoner lacks any significant history of violent crime; . . . (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Cal.Code. Regs., tit. 15 § 2402(d).

Id. at 663 n.4.  It has been clearly established by the United States Supreme Court "that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' Sass, 461 F.3d at 1128-29 (citing Superintendent v. Hill, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)); see also Biggs, 334 F.3d at 915 (citing McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457, 105 S.Ct. 2768."  Id. at 662.

      As noted above, the Board relied on the following findings to deny petitioner parole:  (1) petitioner's crime was "carried out in an especially callous manner,"  "[t]he victim was abused during the offense," "[t]he motive for the crime was very trivial in relation to the offense;" and petitioner "had experimented with marijuana and methamphetamine;" (2) petitioner had "not sufficiently participated in self-help and therapy;" and (3) "[t]he psychiatric report prepared for this particular hearing was not conclusive at all," particularly given the then six-year old Category X report that remained in the record.  (Id. at 28-29.)  None of the factors

/////

relied on by the Board is supported by the required minimum of "some evidence" to support the decision.

The Board's reliance on the circumstances of petitioner's criminal offense to support the denial of parole was unsupported by any evidence in the record sufficient to meet the applicable legal standard.  In language that on this record appears to be boilerplate, it found that the crime was "carried out in an especially callous manner" and that "the motive for the crime was very trivial in relation to the offense."  These terms have been defined by the California courts as follows:

> A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.  [In re] Dannenberg, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005).  Factors beyond the minimum elements of the crime include, *inter alia*, that "[t]he offense was carried out in a dispassionate and calculated manner," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal.Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E)."

Irons at 663; see also In re Weider, 145 Cal.App.4th 570, 588 (2006) (to support denial of parole, the "factors beyond the minimum elements of the crime" "must  be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.")

In California, "[s]econd degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements--i.e., willfulness, premeditation, and deliberation-that would support a conviction of first degree murder." People v. Nieto Benitez, 4 Cal.4th 91, 102 (1992).  "Malice, for the purpose of defining murder, may be

1   express or implied.  (§ 188.)  It is express 'when there is manifested a deliberate intention

2   unlawfully to take away the life of a fellow creature.' (§ 188; People v. Mattison (1971) 4 Cal.3d

3   177, 182, 93 Cal.Rptr. 185, 481 P.2d 193.)  Implied malice is present "when no considerable

4   provocation appears, or when the circumstances attending the killing show an abandoned and

5   malignant heart." (§ 188; People v. Mattison, supra.)."  Id. at 102-103.

6          Under California law,

7          "all second degree murders by definition involve some callousness
           – i.e., lack of emotion or sympathy, emotional insensitivity,

8          indifference to the feelings and suffering of others.  [Citation.]  As
           noted, however, parole is the rule, rather than the exception, and a

9          conviction for second degree murder does not automatically render
           one unsuitable."  (In re Smith (2003) 114 Cal.App.4th 343, 366.)

10         . . . .

11         Therefore, to demonstrate 'an exceptionally callous disregard for
           human suffering' [within the meaning of applicable provisions of

12         the California parole statutes], the offense in question must have
           been committed in a more aggravated or violent manner than that

13         ordinarily shown in the commission of second degree murder.

14  In re Scott, 119 Cal.App.4th 871, 891 (2004).  Such circumstances may include "rehearsing the

15  murder, executing of a sleeping victim, stalking," id., or evidence that the defendant "acted with

16  cold, calculated, dispassion, or that he tormented, terrorized or injured [the victim] before

17  deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and

18  suffering."  In re Smith, 114 Cal.App.4th at 367.

19         Similarly, in In re Scott the court noted that a finding of "triviality" sufficient to

20  justify the denial of parole must also relate to present dangerousness:

21         The offense committed by most prisoners serving life terms is, of
           course, murder. Given the high value our society places upon life,

22         there is no motive for unlawfully taking the life of another human
           being that could not reasonably be deemed "trivial." The

23         Legislature has foreclosed that approach, however, by declaring
           that murderers with life sentences must "normally" be given

24         release dates when they approach their minimum eligible parole
           dates. (Pen.Code, § 3041, subd. (a).) The governing statute also

25         states that the Board shall set a release date "unless it determines
           that the gravity of current convicted offense or offenses, or the

26         timing and gravity of the current or past convicted offense or

13

offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code, § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case. The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented

In re Scott, at 893.

The Board described the offense as follows in its decision:

The offense was carried out in an especially callous manner. The victim was abused during the offense. The motive for the crime was very trivial in relation to the offense. These conclusions are drawn from the Statement of Facts, wherein the fact that the prisoner assaulted, attacked a 22 month old child, Aaron Miller. The child was thrown to the floor on at least two occasions and ultimately sustained fatal injuries. The prisoner had experimented with marijuana and methamphetamine.

(Decision, February 10, 2000, at 1.)[7] These facts simply do not support a finding that the crime was committed in a "more aggravated or violent manner" than other second degree murders, and review of the record reveals no evidence that petitioner's commitment offense was carried out with the type of gratuitous violence, torture or disregard for the victim that would permit it to be defined as "especially callous" as that term has been defined by the California courts.

The record before this court shows facts congruent with those described in his 1992 letter by the state court judge who sentenced petitioner. The facts suggest that petitioner was, at the time of the crime, "a very immature young adult who, after having indulged in the use of marijuana, could not tolerate the demands of a very young child for whom he was the expected

---

[7] It appears that the facts are taken from petitioner's version of his commitment offense as set forth in the October 1999 Life Prisoner Evaluation.

1  caretaker." (Ex. 7 to Petition.)  When petitioner was awakened by the victim's sister because the

2  victim was crying, he struck the victim twice, knocking him to the floor and causing the head

3  injury that led to the child's death.  The facts suggest that petitioner lacked "any true intent to

4  seriously injure the young victim." (Ex. 7 to Petition.)  Moreover, while petitioner's response to

5  the crying child  initially tried to avoid responsibility for the injury to the child, he did call for

6  help, transported the child to the hospital, and ultimately accepted responsibility for his actions

7  by pleading guilty to second degree murder and telling the sentencing judge that he deserved to

8  go to prison. (Id.)

9          The record before the Board and before this court does show facts sufficient to

10  support petitioner's conviction for second degree murder based on a finding of implied malice in

11  that "no considerable provocation" appeared for the actions that petitioner took which led to the

12  death of the victim.  The record does not, however, show any facts which suggest that the

13  circumstances of the crime were sufficiently callous, or the motive for petitioner's actions

14  sufficiently trivial, that sixteen years after the offense the circumstances of the crime would still

15  suggest that petitioner remained a danger to society.[8]  Absent such facts, the Board's reliance on

16  petitioner's criminal conviction to support the denial of parole violates petitioner's right to due

17  process.

18          The other two factors relied on by the Board, that petitioner had not participated

19  sufficiently in self-help or other available therapy, and that the 1999 psychiatric report was too

20  conclusory in light of the 1994 Category X report are not just unsupported by the record:  the

21  Board's findings are contradicted by the record.

22  /////

23

24          [8]  The Board also referred to petitioner's use of marijuana and methamphetamines at the
   time of the offense.  It is completely unclear, because the Board did not elaborate, how this
25  finding relates in anyway to a determination concerning the callousness of the offense or the
   triviality of the motivation.  Moreover, the record amply demonstrates that petitioner's history
26  of substance abuse has been in remission for years.

1    The 1994 Category X report cited by the Board notes that petitioner had "attended

2 multiple groups, some quite specific to his issues," including a group for men who had murdered

3 children.  (Category X Evaluation, at 6.)  The Board Report prepared for the October 1999

4 calendar also notes that "[s]ince [petitioner]'s reception in the CDC and the subsequent

5 document incarceration activities, it is quite clear that he has programmed in a positive fashion

6 while availing himself to numerous self-help programs within the prison setting."

7 (Administrative Record, October 1999 Board Report, at 3.)  That statement is support by

8 postconviction progress reports concerning petitioner prepared for the Board of Prison Terms in

9 September 1997 and October 1999.  The October 1999 Board Report notes that petitioner has

10 received certifications in, inter alia, Pastoral Care (Hospice), Breaking Barriers, Man Alive

11 Program, Narcotics Anonymous and Alcoholics Anonymous.  (Id. at 4.)  The report also notes

12 that following his arrival at Folsom State Prison in 1998, petitioner completed the Sierra

13 Foothills Alternative to Violence Project on August 20, 1998, "earned his certificate and

14 appreciate from the Narcotics Anonymous Program on April 8, 1999," was awarded a certificate

15 of merit twice for perfect attendance at Narcotics Anonymous meetings, and was an active

16 participant in Alcoholics Anonymous.  (Id.)

17    The postconviction progress reports attached to the September 1997 and October

18 1999 Board report show the following.  Petitioner "successfully completed the commitment to

19 change program" at California Medical Facility (CMF) in September 1997, and participated in a

20 parenting program at CMF from January 20, 1998 until his transfer to Folsom State Prison a

21 month later.  (Life Prisoner: Post Conviction Progress Report for October 1999, at 1.)  Petitioner

22 "completed a ten week individual counseling program at CMF on 5/8/97 and participated in

23 weekly discussions and psycho therapy group for inmates serving life sentences at CMF between

24 1/27/97 and 4/7/97."  (Id.)  Petitioner requested the individual therapy, and he was an active

25 participant in the group therapy until the group was "suspended because of a prolonged

26 institutional lockdown."  (Postconviction Progress Report attached to Life Prisoner Evaluation

1   for September 1997 Calendar, at 4.)  He also participated actively in the Arts in Correction Music

2   Program at CMF, eventually becoming a lead clerk and earning all above average grades.  (Id.)

3   On August 20, 1998, petitioner completed a 21 hour Basic Alternatives to Violence Workshop at

4   Folsom State Prison.  (Id. at 1-2.)  Petitioner has also been an active participant in the

5   Victim/Offender's Learning Together Program and has "demonstrated an effort toward helping

6   both himself and the victims of crime."  (Postconviction Progress Report attached to Life

7   Prisoner Evaluation for September 1997 Calendar, at 3.)

8              Moreover, it is apparent from review of the record psychiatric reports prepared by

9   Drs. Crawford and Beermann in September 1997 and October 1999, that petitioner successfully

10  complied with the recommendations made by Dr. Trevisano in that he had attempted to follow

11  the evaluations made in the 1994 Category X evaluation.  Specifically, petitioner continued with

12  the AA and NA programs and achieved success in those groups, he participated actively in group

13  therapy, and he sought and received individual therapy as well.  (See Category X Report, at 6.)[9]

14  By 1997, the psychologist reporting to the Board noted that petitioner's personality disorder was

15  "greatly improved" and that his potential for violence, which in the past had been "above

16  average" was by then "below average."  (Psychological Evaluation for Board of Prison Terms,

17  dated September 24, 1997, at 2.)  Reviewing the actions taken by petitioner in response to the

18  1994 Category X evaluation, reading the 1997 and 1999 psychological reports, and reading them

19  in conjunction with the 1994 Category X evaluation, renders unsupportable the Board's decision

20  to continue to rely on the latter to deny petitioner parole.

21             For all of the foregoing reasons, this court finds that the Board's February 10,

22  2000 reasons for denying petitioner parole were not supported by "some evidence" in the record

23  and, therefore, that petitioner's right to due process was denied by that decision.  The state

24  _____

25      [9]   The fourth recommendation made by Dr. Trevisano was that petitioner continue with
    the group for men who murdered children if that group continued at CMF.  While it is not clear
    whether that group continued, the record shows that after the Category X evaluation petitioner
26  participated actively in a Victim/Offender's Learning Together Program.

1    courts' rejection of this claim was contrary to controlling principles of United States Supreme

2    Court authority.  Petitioner's first claim for relief should be granted.

3          B.  Suitability/Unsuitability Criteria

4                In his second claim for relief, petitioner contends that he meets none of the state

5    criteria to support a determination that he is unsuitable for parole, that he meets nearly all of the

6    criteria supporting a finding that he is suitable for parole, and that he cannot comply to any

7    greater degree with the recommendations made by the February 2000 panel.[10]  The principles of

8    federal constitutional law applicable to petitioner's challenge to the February 2000 denial of

9    parole requires this court to determine whether "some evidence" supported the decision of the

10   California Board of Prison Terms.  Those principles do not authorize this court to weigh all of

11   the factors relevant to a parole suitability determination in California.  To the extent that

12   petitioner's second claim urges that undertaking on this court, it should be denied.  For the

13   reasons set forth in the discussion of remedy infra, the Board has already made findings which

14   show that no purpose would be served by requiring a further parole consideration hearing for

15   petitioner.  This court need not revisit those findings, nor is it necessary on this record to engage

16   in a complete review of all the statutory criteria for parole in order to recommend an appropriate

17   remedy in this case.

18   /////

19

20        [10]  In accordance with section 2402 of title 15 of the California Code of regulations, "the
     circumstances tending to show that a prisoner is unsuitable include: (1) the commitment offense,
21   where the offense was committed in 'an especially heinous, atrocious or cruel manner'; (2) the
     prisoner's previous record of violence; (3) 'a history of unstable or tumultuous relationships with
22   others'; (4) commission of 'sadistic sexual offenses'; (5) 'a lengthy history of severe mental
     problems related to the offense'; and (6) 'serious misconduct in prison or jail.' Cal.Code. Regs.,
23   tit. 15 § 2402(c).  Circumstances tending to show that a prisoner is suitable for parole include: (1)
     the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable
24   relationships with others; (3) the prisoner has shown remorse; . . . (6) the prisoner lacks any
     significant history of violent crime; . . . (8) the prisoner 'has made realistic plans for release or
25   has developed marketable skills that can be put to use upon release'; (9) '[i]nstitutional activities
     indicate an enhanced ability to function within the law upon release.' Cal.Code. Regs., tit. 15
26   § 2402(d)."  Irons v. Carey, at 663 n.4.

C.  Vagueness of Statutory Criteria

Petitioner's third and fourth claims for relief are grounded in the contentions that the "cruel, heinous and atrocious" language of section 2402(c)(1)(A-E) is too vague to pass federal constitutional muster, and that the Board's application of those criteria[11] impermissibly usurps a legislative function.  As noted in section IIA, supra, the courts in California have interpreted the statutory language challenged by petitioner here in a manner that permits this court sitting in federal habeas corpus to determine whether there is any evidence to support the Board's application of these criteria in petitioner's case.  While the court finds that the absence of evidentiary support for the Board's findings in this case could be viewed as rendering the statutory criteria virtually meaningless, the court does not find either that the criteria themselves are unconstitutionally vague, or that the Board has improperly usurped a legislative function in its application, however unsupported by the record, of those criteria.  These two claims for relief should be denied.

D.  Remedy

For the reasons set forth in section IIA, petitioner is entitled to relief on his claim that his federal constitutional right to due process of law was violated by the February 2000 denial of parole.  Under the circumstances of this case, the appropriate remedy is to require the Board to immediately set a parole date for petitioner.

Since the February 2000 hearing at issue in this action, petitioner has been denied parole four more times.[12]  The most recent denial was on September 26, 2005, and a copy of the transcript of that hearing has been filed by respondents as an exhibit to a December 2005 motion

---

[11]  These criteria were applied by the Board in its findings that the crime was carried on in an "especially callous" manner and that the motive for the crime was "very trivial."

[12]  Petitioner's motion to expand the record to include records from his subsequent parole consideration hearings that post-dated the hearing at issue in these proceedings was denied by order filed May 26, 2005.  The fact of the denials may be judicially noticed by this court.  See Fed. R. Evid. 201(b).

1   to dismiss this action.  The September 26, 2005 decision again reflects reliance primarily on the

2   circumstances of petitioner's commitment offense, which at the time of that hearing was twenty-

3   two years in the past, to support the denial of parole.  (Ex. A to Motion to Dismiss, filed

4   December 14, 2005, at 54-57.)  The September 26, 2005 decision also reflects the Board's

5   decision to again reject the most recent psychological report available to it, a favorable report

6   from a psychologist named Kathleen O'Neara, finding instead that an earlier assessment "still

7   stands today" despite the favorable report.[13]  (Id. at 57.)  This pattern repeats the formula used in

8   the February 10, 2000 denial of parole, and there is no reason to believe that one more parole

9   consideration hearing would serve any purpose in remedying the violation of petitioner's

10  constitutional rights that occurred at the February 2000 parole consideration hearing.[14]

11  Accordingly, the Board should be directed to set a parole date for petitioner forthwith.

12          In accordance with the above, IT IS HEREBY RECOMMENDED that:

13          1.  Petitioner's application for a writ of habeas corpus be granted; and

14          2.  Respondents be directed to forthwith set a parole release date for petitioner.

15  /////

16

---

17  [13]  The court notes that the report relied on by the Board "indicated that integration of
    emotion remained a problem for [petitioner]" and carried a recommendation that petitioner
18  continue his "involvement in introspective endeavors."  (Id. at 58.)  At the September 2005
    hearing, petitioner testified there was no therapy available to him at Avenal State Prison, and that
19  he was taking self-help courses through the mail.  (Id. at 36.)  In light of that testimony, the
    Board's recommendation to petitioner that he "take advantage of whatever self-help or therapy
20  programs may be available within the institution to assist you in developing insight into the
    causative factors of the commitment offense" is troubling indeed.  Conditioning a grant of parole
21  on participation in programs that are unavailable in the institutional setting would seem to raise
    serious constitutional concerns.
22
    [14]  Indeed, the September 2005 decision reflects an apparent determination on the part of
23  the Board to withhold parole from petitioner based on his commitment offense without regard to
    the numerous other considerations that demonstrate his suitability for parole.  The 2005 panel
24  elaborated on the circumstances of the commitment offense in great detail in a manner that
    emphasizes the tragedy of the offense but in no way shows that petitioner is a present danger to
25  society because of that offense.  Moreover, the panel notes that since petitioner was convicted of
    second degree murder "it would not be reasonable to expect that [he] would be granted parole
26  during the next two years."  (Id. at 55-56.)

1          These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

3   after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

6   failure to file objections within the specified time may waive the right to appeal the District

7   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8   DATED: May 17, 2007.

9

10                                    UNITED STATES MAGISTRATE JUDGE

11

12   12
     fowl2250.157
13

14

15

16

17

18

19

20

21

22

23

24

25

26